On April 27th, 2017, at 5 p.m., Shari Guertin and all of her students made a mutual appointment at Wal-Mart. Both Guertin and her two students were released, five minutes were deleted, and two minutes were shared via email. On behalf of the individual MDEQ regulators, I've been allocated nine of defendants' 20 minutes, and I'll reserve two of those for rebuttal. May it please the Court. The District Court's qualified immunity ruling should be reversed for two basic reasons. First, there is no clearly established substantive due process right to bodily integrity in the particularized context of exposure to contaminated public drinking water. And second, even if you accept all of the plaintiff's allegations as true, they fail to establish a violation of any such right. Let's start with the first question. To avoid qualified immunity, it is the plaintiff's burden to show that they have a clearly established constitutional right in the specific context of the case, not a general proposition. As this Court confirmed in Arrington Bay and the U.S. Supreme Court confirmed in White v. Pauley both last year, you need a case with a similar fact pattern. So what that means is a legal template that you can put on the facts, and it's pretty darn close. It doesn't have to be an exact match, but it certainly has to put the public officials on notice that what they're doing is unconstitutional. And without that limit, public officials are exposed to unlimited liability because plaintiffs can make vague allegations as they've done here. Now, to date, no decision of the Supreme Court or of this Court has even recognized a constitutional right to a safe environment, much less a right to safe drinking water, much less a right that government regulators will act in a certain way when there's a crisis with the water supply. In fact, the only case that's even really remotely close to this is the 2018 District of New Jersey decision that we cite in the Wyant Reply Brief at page 4. And this is the Branch case decided January 2018, which also involved parents who filed suit on behalf of their children who had been exposed to lead in the water at their school, and they sued the state and local officials who were responsible for that. And you look at the allegations in that case, and they look just like the ones here. The plaintiffs said that the children were knowingly exposed to contaminated water, that there was a government cover-up, that there was a failure to monitor, that there were filters that would have prevented the problem and they were intentionally not replaced, that the public was provided misinformation, and that there were no steps to remediate. And yet, the district court in that case appropriately recognized that there was no authority that would have established a clearly established constitutional right in that context. In fact, the cases went the other way. And to the extent that there's any ambiguity or lack of clarity, that's dispositive. Qualified immunity applies, and that's the end of the story. And if you look at all the cases that the district court cited in support of her qualified immunity ruling, they're very different because they involve things like forced medication and forced medical treatment. All these things involve someone forcibly doing something to somebody else's body. One that didn't, that is cited by the district court, is the Omri-Cincinnati radiation litigation. And that's the case where the plaintiffs thought they were receiving legitimate radiation treatment for their cancer, and in fact, even though they willingly but unknowingly appeared at the hospital in front of the doctors, that they were really subject to an experiment by the Department of Defense to see how much radiation people could take during the war. And there's no force there in the radiation case, is there? Well, there really is, because it's the government that's directly, affirmatively taking some action to put that substance in their body. And with respect to the defendant MDEQ regulators, there are no allegations anywhere in the complaint that that's what was happening. Well, here their allegation is that they're furnishing the public water supply, and the public water supply goes to the plaintiff's homes, and they turn the tap on, and then they voluntarily drink the water supply that the defendants have contaminated. But with respect to the individual DEQ regulators, they were not the ones supplying the water. I'm talking in general right now. Right, and there's other aspects of this case where that question may come into play. But to try to distinguish these cases, why is that so different from this radiation case? Because there isn't a case anywhere, radiation or otherwise, that imposes constitutional liability for bodily integrity on regulators who did nothing more than communicate with each other, communicate with the EPA, in rare instances communicate with the public, all in the context of not having any duty to anybody, where they were trying to do the best that they could in very difficult and quickly changing circumstances. We don't get into the facts in an interlocutory appeal on qualified immunity. We accept the facts as alleged by the plaintiffs. With one caveat, we certainly accept the factual allegations, but as you were pointing out in the previous case, to the extent that there are alleged conclusions, you know, things that people were lying and that they were hiding, those are the types of things that under Iqbal and Twombly, we don't accept. We accept the facts that they plead. Well, it has to be plausible. And, you know, usually those types of allegations have questionable plausibility, but this case is a little different. Well, even if you accept the underlying plausibility of the actual alleged facts, there still isn't the template that you can put on top of this, just like the branch court held. You know, so it's a threshold matter. The part, though, about a template, Mr. Burch, is that everybody seems to say this is the unusual case, and arguably outrageous case. So, is there an argument that can legitimately be made that even though there isn't a similar case or a template case, as you would say, that this is so outrageous that essentially the plaintiffs are saying everybody should have known that they couldn't or shouldn't do what they were doing? Right, and it's kind of a hope for the Pelser argument, really. Right, it is. And White v. Polly, the Supreme Court decision from last year, made it clear that that's extremely rare. Selling a child into slavery, for example, might satisfy that type of standard. But it's important to separate two things that plaintiffs are saying here. The severity of the conduct, which is one thing, and the alleged constitutional right, which is the other. So, for example, if you had school officials who acted in the most shocking, outrageous manner possible to deny students a chess club, even though that conduct is alleged to be outrageous and completely unique, if there's no constitutional right to have a chess club, you can't proceed with the claim. And here they're asking for a bodily right to integrity in the context of the public water supply that no court anywhere has ever recognized. Now, if you wanted to exercise your substantive due process powers and expand the realm of causes of action, you could do that. I wouldn't recommend that. You could have, you know, you've got the authority to do that. But even then, that doesn't mean that it's clearly established for these individual regulators. The problem with a clearly established analysis is each case is factually different. I mean, you have the forced sterilization case where they sterilized people without their consent. Well, the next case is pumping the stomach of somebody else. And the same argument you make today is that there is no case that says pumping somebody's stomach involuntarily violates the right of bodily integrity. All you have is you have a sterilization case. You don't have a case on point here, but that defense wasn't sufficient for the Supreme Court. They said it's close enough. It's close enough to give you notice. And every case is a little different from the preceding case. And their argument is that they build upon one another, and the ultimate conclusion is that under this scenario you would know, based upon these other different factual scenarios, that this violates the constitutional right. I mean, what... Right, and Judge Griffin, those kinds of factual distinctions, that's not our argument. What I hear you saying is... I thought it was. I thought you were saying you need a case that's almost right on point. Well, you do. And what you're talking about is a situation where you have clearly established precedent that says a guard can't beat someone with a wooden baseball bat, and then the next case comes along and it's an aluminum baseball bat, and you say, oh, well, those facts aren't exactly the same. Well, stomach pumping is a lot different than forced sterilization, is it not? I think it's a difference in kind. But here you're talking about regulators who were sitting in their offices trying to do the best that they could in difficult and quickly changing circumstances. They weren't acting with malice. They wasn't forced. And if you look at these cases, you can't find any case anywhere, even remotely close, where a public official was held liable for failing to intervene, for simply approving a permit, for failing to take some action. I mean, the branch court, again in New Jersey, kind of ran through this. And to the extent there are any cases that are even within the realm of closeness, as you say, the forced radiation versus the stomach pumping, they all go the other way in favor of the regulators. And the problem with accepting the district court's argument is that you open up for unfettered liability everybody in government who is approving food, who is approving medicines and medical devices, who are granting or even failing to grant environmental permits. That's different because all of those involve a third party. These are third parties. I'm representing the third parties. No, all of those examples involve regulating a third party. This case has to do with the government sending the water in. And then the regulators supposedly lying about it. To be perfectly clear, the individual DEQ defendants weren't sending water to anybody. They were checking off boxes, telling the city of Flint, yes, we agree with the plan that you're proceeding with or not. They're just like the FDA. They're just like the medical device approver. They're just like anybody in the DEQ department who's giving someone a permit for something. These are the consummate everyday government officials trying to do their job the best they can and not always getting it right. And the thing about qualified immunity is that you don't always have to get it right. So long as you're not acting in such a way that the law clearly prohibits it. White v. Polly says, Your Honor, it's got to be really close. Okay, let's say you're a regulator and you're trying to make choices between different options. That's one thing. Now say hypothetically that you are falsifying records or you are stating things that you know to be untrue to achieve a particular result, knowing that people are going to be ingesting poison, hypothetically. Wouldn't a reasonable regulator know that, yes, you can make mistakes, but you can't lie? You can't say that something is true that isn't, especially when you know that the result is going to be that people are poisoned. Right. And before I answer that question, just to caveat how hypothetical this is, the one instance where they allege that there's some kind of a lie, which of course is conclusory, is with respect to this Bush email to the EPA about corrosion control. And even there, if you look at paragraph 33 of their complaint, which is on page ID 10 of the district court record, all you said is that Flint has a corrosion control plan. And that was true. There was nothing false about that. What? That Flint had a corrosion control plan. I thought that he said that Flint is using maximum corrosion control? Paragraph 33 of the complaint says that Flint has a corrosion control plan. And another sidebar, if you look at the way that they're alleging the facts in their appeal brief, they're very different than the complaint. Because the district court took a lot of liberty with the factual allegations and drew legal conclusions from them. And if you look at pages 31 to 36 of their brief, when they're actually analyzing the facts as opposed to the clearly established right, they're almost all sites to the district court opinion rather than to the complaint. And we lay out exactly what the complaint says in our briefing, so I won't dwell on that. But hypothetically, even with the lie, that's a fairly serious government act of misconduct. No evidence of that here. There's not a legal template that says that a government official's false statement about something like that could lead to liability for violation of the bodily integrity right in the context of water quality. It just isn't there. And I realize my time is done, but I just wanted to very quickly state that even if you would move past that and ask the second prong, have they established the right, they would have to show that the force was inspired by malice or sadism akin to what happened to the special ed students in Domingo. They haven't done that. They have to show some affirmative violation, not merely a failure to intervene. The Supreme Court has said that. And there has to be some physical force or abuse. And the other side cites a couple of contrary cases which we distinguish in our reply. Physical force? Okay. I mean, there was no physical force in the radiation case, was there? Well, to the extent that they were forcing someone, well, I shouldn't say forcing. They were giving them the radiation take. You can't say that regulators were giving anyone the wire. They didn't do it by force. They did it, I mean, willingly but unknowingly, I guess, why they were doing it. Okay. Any further? You'll have your rebuttal. Yes. Thank you. Any further questions? No. Thank you, Mr. Othellos. Good morning, Your Honors, and may it please the Court. Assistant Attorney General Zach Larson on behalf of Michigan Department of Health and Human Services Director Nick Lyon and Chief Medical Executive Dr. Eden Wells. Director Lyon and Dr. Wells are alleged to have had a limited and after-the-fact role in the events of this case. Neither is alleged to have been involved in the decision to switch to Flint River water or in the treatment of that water or even in regulating the treatment of that water. Instead, plaintiffs allege simply that they did not alert the public of possible lead concerns more than 17 months after the switch to the Flint River and just weeks before the city switched back to Detroit water. But no court has previously held that a public health official violates the Constitution by not publicizing a health concern promptly enough. And not only have plaintiffs and the trial court failed to identify any factually similar cases supporting that proposition, but there is nothing even remotely close. So for those reasons, Director Lyon and Dr. Wells are entitled to qualified immunity and this Court should reverse. Mr. Larson, as I understand your argument, maybe even in the broader sense, the claim has been made that the MDEQ folks had a statutory duty here to have some involvement in making sure the municipal water systems were safe. Fair? Sure. So your argument, as I understand it, is that the Department of... Health and Human Services. Health and Human Services has no duty in connection with public water. Is that right? That's correct. I mean, if you look at it as sort of levels of relationship to the conduct at issue or to the injury at issue, we're a step even further removed. So what do they have a duty to do? I mean, if it's health, it seems like the slant right to health. Sure. Well, under qualified immunity analysis, the question has to be tied to whether or not a reasonable official in their position would know that what she's doing violates the law. And specifically, the allegation is that they failed to alert the public. I'm backing up a step before you get it. If you don't have a duty to begin with, it's harder to say that you knew you had to do something. If you have a duty to do something and you failed to do it, it's easier to make that claim. So what was their duty here with respect to the quality of the water? We would say constitutionally, they are not given a duty. And statutorily, they're not given a duty with respect to the quality of the water. Would they dissent? I think the allegation is that they were disseminating information that they knew was false. Well, I don't believe that there's any specific allegations that they made public statements that were false. And if you look at the specific allegations, what they're latching onto is an internal email from Director Nick Lyon that occurs just two days before the Department of Health and Human Services makes a public statement that says, in fact, there is a problem with the water. And what that email says is, you know, we've gotten this analysis from Dr. Mona, and we'd like to make a response suggesting what we think is, in fact, occurring here. And so we asked lower-level staff officials to engage in their own independent analysis, which is a very important step so that as a matter of public health, they know what's going on and that it's clear that they have correct information as to what the problem is before they take that to the public. And just two to three days later on October 1, 2015, it's paragraph 314 of the complaint, they make a public statement that it says confirms Dr. Mona's analysis. So I don't believe there's any specific factual allegations that would support the notion that they're making false statements to the public. But even if they were, there's a case from the Second Circuit in Lombardi v. Whitman that is probably the closest case that you have to anything relating to a public health official's duty to report. And what it says is that, number one, they don't have any duty to alert the public with respect to public health problems, such as, in that case, air contaminants, because that would be simply a failure to act, which is not sufficient to support a violation under the Due Process Clause. But in addition to that, EPA was specifically alleged to have been making false statements, and the court said that even in those circumstances, EPA was not liable for a Due Process Clause violation because there was a countervailing governmental interest. Now, with respect to MDHHS, again, there are no specific allegations that point to false statements that they made. Instead, the limited role of Director Lyon and Dr. Wells was that they were informed about a possible problem as a result of blood lead tests. They asked lower-level staff to conduct an analysis. That analysis was conducted, and ultimately, just a few days later, they issued a statement saying, yes, there, in fact, may be a problem here. Paragraph 253 says that your clients intentionally withheld information which conclusively showed that the children of Flint had been poisoned. Is that an allegation of intentional misconduct? I would suggest that that type of allegation is the type of conclusory allegation that ICFAL specifically disregards, because if you look at ICFAL and the facts in that case, the allegations in the pleadings in that case, there was an allegation that John Ashcroft was intentionally discriminating and intending harm to the plaintiff in that case. And the court said, you know what, that's a conclusion. We're not going to look at that when we determine whether or not there's a plausible claim here. And so that first step under Twombly and ICFAL is to separate the wheat from the chaff and say what are the specific factual allegations rather than conclusions as to the intent of the defendants or conclusions as to matters of law or arguments that they're making. Well, I mean, within that is a factual allegation that they withheld information that showed this. So that would be factual. Well, if all their intent is actually probably an issue for the prior facts. Actually, Judge Griffin, if you look at the history of qualified immunity cases, one of the things that the Supreme Court did a number of years ago is it tried to move away from the subjective analysis where you could make those types of assertions just to get past a motion to dismiss and instead moving to the subjective analysis where you say, you know, looking at the alleged conduct of these individuals, the specific things they did, whether or not you can make out a claim on that basis. And so if you're looking at the specific things they did, those are things like, you know, they were informed on September 28th or 29th that there may be a problem here. They asked lower-level staff to evaluate it, and ultimately they made a statement to the public. I think the interesting thing about paragraph 253 that starts out with the word instead has to be read in connection with paragraph 252. 252 says where MDEQ caused, obscured, and lied about the lead problem, MDHHS should have discovered and revealed it. And then the next paragraph in light of that goes on and says instead they did something else. So the claim, reading those two together, seems to be that they should have discovered and revealed it. Correct. And we have to figure out is there a constitutional violation, and was it clearly established to being you should have discovered and revealed something. And there is not, because under both Lombardi and under DeShaney, it's very clear that, and under this court's decision in Hunt, it's very clear that mere omissions or failures to act, the type of allegations that are really akin to negligence, cannot support a due process violation. And so given that that is the gravamonte of the complaint against MDHHS, it cannot support a claim, let alone a violation of clearly established law. But your argument is that even, let's assume it is a factual question, regardless of the outcome of the factual resolution, there is no constitutional violation if a government official in MDHHS obscures, obfuscated, and intentionally withholds information. Well, maybe there should be, but there isn't. That's your argument, right? There is no case law that suggests that, and the Lombardi case suggests the opposite. Though again, those are conclusory allegations with respect to their intent that we think under Iqbal are not to be considered in this analysis. Any further questions for Mr. Lerner? Thank you. Good morning. Good morning. May it please the court, I am Frederick Berg, and I represent the appellants of the City of Flint, and I'm here authorized to speak also on behalf of Darnell Early Emergency Manager, Gerald Ambrose Emergency Manager, and Howard Croft, who was the Flint Water Treatment Plant Superintendent. I'm reserving one minute for rebuttal. Because I have very short time, the parties are relying on our briefs with respect to our Eleventh Amendment argument, and we will speak only to the constitutional arguments with respect to whether or not the plaintiffs have stated a claim under the Fourteenth Amendment. I have three points to make. First, it's very important, even though the court has the option to choose, which of the factors it will analyze first, whether there is a claim stated under the Fourteenth Amendment of the Plaintiff's Facts or whether it's been clearly established. We ask the court to deal with the constitutional question because the City of Flint is the only governmental entity left in this case, and it does not benefit by qualified immunity, and therefore the clearly established prong does not pertain to it. Consequently, when this court reviews whether a claim has been properly stated or not, it should look to the case of Collins v. Harker Heights, which says a couple of things that are very important. One, the court is very reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this uncharted area are scarce and open-ended. Also, in that case, it's perhaps the most factually analogous. The municipal employer sent an employee into a job that it knew was perhaps harmful. It did not warn him, and he died. The court found that that employee did not have a claim under the substantive due process analysis under the Fourteenth Amendment. The reason it was because the clause under the Constitution as written says that it's phrased as a limitation on the state's power to act, not as a guarantee of minimal levels of safety. Looking at whether the plaintiffs in this case stated a constitutional violation, they did not. All of the cases which prior counsels have referred to with respect to intentional invasion of bodily integrity are specifically targeted at individuals who are there present before a state actor and being acted upon with intent by a state actor. Here we have departments and a number of individuals, all of whom have influence over a great big process, which is the distribution of water, in which a dispersed harm has occurred to many individuals as alleged. That's not equivalent to any of the factual patterns that exist in any of the cases on which Judge Levy relied. There is no case, and the plaintiffs don't pretend that there is such a case, whereby this court can point to and say on a large-scale basis where this kind of harm is alleged, that a government has acted with a requisite level of intent that is necessary to establish a claim under the 14th Amendment. With respect to the last point and whether it's clearly established, first of all, the plaintiffs have not alleged adequate conduct on the part of these individuals to state that each individual defendant has engaged in unconstitutional conduct which is sufficient in order to establish a constitutional violation, and therefore it's not clearly established against them. Secondly, as Mr. Birch said, there are no cases, and this court, as a matter of law, needs cases with factual similarities in order to establish a clearly established prong. Third, under some circumstances in the Sixth Circuit, even the city benefits by the lack of clearly established law. For example, in Arrington Bay, the court held that in cases of failure to train, the city is entitled to have clearly established law in order to know what to train before the city can be held liable. There's an entirely separate allegation prong with respect to whether the city is liable. The city can only be liable if it caused the harm, and it can only cause the harm if it has a policy or practice or if it has failed to train. And the Arrington Bay case says very clearly that failure to train can't be established unless there's clearly established law that says you're supposed to train in a certain way. There are other cases in which this court has said the same thing. I'll just finish that sentence. In particular, with respect to zoning, the court has said, in zoning cases, you have to have clearly established law in order to... I'm just wondering if you're not conflating a couple of things here in terms of your failure to train argument, which frankly I don't even understand how that applies to start with. I thought the case that said that you don't have to train unless you know of the need for training. That's essentially what the New Orleans case says involving Connick. That's different than saying there's clearly established law that tells you what you have to train on. Perhaps it is, Your Honor. In order for the plaintiffs to prevail against the city, they have to have a constitutional claim and a claim that the city has had a policy or practice or failed to train. I don't even understand why we get to failure to train. This is a Monell argument basically involving the city of Flint. There just simply has to be either a policy or practice here. It's pretty obvious when you have a city council resolution or you have an emergency manager decision on behalf of the city council saying we're going to switch and we're going to start pumping the water. Why would we ever get to failure to train? I think I can answer the court's question. If the court were to say we are determining that a claim under the 14th Amendment exists and also say we are not going to hold the individuals liable because it's not been clearly established. However, but because the city does not benefit by qualified immunity, it remains liable because it doesn't have that immunity. But they're not even claiming that the source of the liability is failure to train. Train who? The allegations. Managers? Water operators? That allegation is present in the complaint, Your Honor. It is present in paragraph 22. Paragraph what? 22. Okay, thank you. All right, any further questions for Mr. Berg? Mr. Berg, you'll have your one minute rebuttal. Thank you. Good morning. Good morning. Kurt Krause on behalf of Robert Scott, Your Honors. May I please the court, please know that counsel for the State of Michigan defendants did not take lightly having reserved this one minute for Mr. Scott, the lowest level state employee in this matter. Indeed, we collectively agreed that it was important to reserve this time for Mr. Scott as to one crucial point. And that is to emphasize to the court to carefully look at and assess the claims against each of the defendants in this case as opposed to lumping them all together as plaintiffs in the trial court did. Each employee's respective role must be examined individually here. The trial court at least purported to analyze them separately, did she not? I would say purportedly, yes. It's very brief as to Mr. Scott. It's a comprehensive opinion by her, and she goes through all the counts, I don't know, 10 counts or something, and all the defendants. I mean, she did a very comprehensive job. Whether it's right or not is another question. Well, I am not sure in terms of that comprehensiveness as to Mr. Scott, the lowest level employee in this case, and the idea that he was, she took judicial note of the fact that he has been criminally charged. And he's not even had his preliminary examination yet. And so that is another basis for our argument. That is another issue that there's a pending motion to take judicial notice of the indictments, and the panel has not yet ruled on that, just so you know that we will rule on it. But we haven't made a decision on it at this point. Thank you, Your Honor. So I just wanted to emphasize, but I can't emphasize enough, that each of these defendants have to be looked at in their own respective roles, particularly as to the conclusory claims. I totally agree with you. As far as Mr. Scott is concerned, Your Honors, the plaintiffs and the trial court totally ignored his actual duties at the department, and we believe he's absolutely entitled to qualified immunity. All right. Any further questions? Mr. Krauss. Thank you. Good morning. Good morning. May it please the Court, Michael Cafferty on behalf of Defendant Nancy Peeler. I also have a brief amount of time, and I just wanted to essentially join in with the arguments that the other side makes, but I would like to point out that Ms. Peeler's position here, she is a civil servant. She's basically a mid-level Michigan Department of Health and Human Services employee, having nothing to do with the water system. A very small portion of her job involved reviewing blood level tests that are mandatorily reported by laboratories and physicians through a system where they get reported. It's a small portion of her job. She had no involvement in this, per the plaintiff's complaint, until some 16 months after the switch of the water system, which clearly, as an MDHHS employee, she had nothing to do with. The allegation that somehow her interpretation of statistical data involving blood level tests violates the plaintiff's right to bodily integrity, in terms of a qualified immunity analysis, there's absolutely no case law that would have put her on fair notice that her analyzing blood tests, sitting in her cubicle analyzing blood tests, would violate somebody's right to bodily integrity. I do agree with your comments, Judge Griffin, that there was some care taken by the district court to talk about different people's roles, but in terms of the qualified immunity analysis, the district court, the cases cited for saying there's no qualified immunity, were the same cases cited for the DEQ employees as they were for the MDHHS employees. I think that was error, because I think you have to analyze them specifically. I don't think there's any case law that would have put an employee in the position of Nancy Peeler on fair notice that her analysis of this data, which is a tiny portion of her job, is violating somebody's right to bodily integrity. Unless the court has any questions, I'll sit down. Thank you. Did I mention I wanted to reserve five seconds for rebuttal? You didn't. Thank you. All right, let's hear from the plaintiffs and the amicus. Good morning. Good morning, Your Honor. May it please the court. I'm Paul Geske, and I represent the plaintiffs' appellees. Your Honor, I've ceded five minutes of my time to the amici plaintiffs in the Flint water cases. The government defendants in this case acted affirmatively to put plaintiffs in harm's way. Over a period of two and a half years, defendants made a long series of disastrous and callously indifferent decisions, which poisoned an entire city through lead-laden and bacteria-laden water. During these two and a half years, defendants disregarded the risks of using the Flint River as a water source, then concealed and affirmatively misrepresented the dangers of continuing to consume Flint River water. Mr. Geske, what would be really helpful here, at least as to me, is instead of speaking globally about what happened in Flint overall and instead of speaking globally about the defendant, it seems to me that there may be three separate and discrete time periods in what allegedly went wrong during each of those time periods. One is the decision to switch. A lot of these people are not involved in the decision to switch at all, right? That's correct, Your Honor. Then the second decision is to start distributing the water through a plant that didn't have adequate lead corrosion control systems, right? Is that a fair statement? I would agree, Your Honor, that those are two separate actions. Switching would have been okay had they been properly treating the water. I would agree with that, Your Honor. You got switching, you got then distributing it through a plant that wasn't properly treating the water. Now this water is out into the system. So then the third stage here is everything that happened next, which is largely not requiring them fast enough to start treating the water. It's the interpretation of the lead and copper water rule, and maybe the fourth period would be falsifying or misleading the public. So if you've got these four different periods, at least the way I see it, and you've got different people that had different rules at different periods, when we just speak about them all at once, we really make it difficult to understand both the constitutional violation that each person did, the source of it, and whether it was clearly established. Well, Your Honor, what we try to do in the brief and in the complaint as well is to divide the defendants into three general categories. You have the MDEQ defendants, you have the Flint defendants, and you have the MDHHS defendants. Now the first two categories that Your Honor mentioned, the initial decision to switch to the Flint River and the evaluation of whether the Flint water treatment plant was capable of adequately treating that water, those were decisions that actually date back to 2013 because the decision to switch was actually made by Flint's prior emergency manager, Mr. Kurtz, who is not party to this appeal. But even prior to the actual switch, defendants had, and when I say defendants I'm referring to the MDEQ and the Flint defendants, they had ample opportunity not only to evaluate the Flint River as an adequate drinking source, but to also evaluate whether the Flint water treatment plant was capable of treating that water. So is there a distinction constitutionally, assuming there is a right to bodily integrity that's violated by contaminated water, is there a difference between making the decision to do it and simply having had an opportunity to evaluate it and not having done it? Well, Your Honor, I think both of those types of conduct can give rise to a constitutional violation, especially in a situation like this one where we're not just talking about split-second decisions. We're not talking about decisions that require reliance on other information or conflicting information, and we're not talking about defendants who were even subject to competing obligations at the time. The defendants were not in a catch-22 scenario where they were deciding, do we switch to the Flint River or do we decide between that and this other potentially unconstitutional alternative? Presumably the MDEQ people either played a role in that or they could have played a role. Let's assume that for a second. But the MDHSHS people didn't have anything to do at that phase, did they? The MDHHS defendants were not responsible for the initial transition, the initial decision to transition from the Detroit Water Sewage Department to the Flint River as a temporary drinking source. They weren't involved in whether the plant should be producing water that wasn't treated either, were they? No, Your Honor. In other words, when we're analyzing them, this gets back to the problem here. We have to figure out what each person did and how that violated the right to bodily integrity because they came in at different times during this approximate 18-month period. Yes, Your Honor, and the complaint lays on... Do you think Judge Levy did that in connection with both the constitutional right and whether it was clearly established as to those groupings of defendants? Well, actually, Judge Levy did more than that. Judge Levy analyzed each defendant individually and found that the complaint sufficiently alleges what each defendant did and how they're culpable and how they're involved. But again, going back to the MDHHS defendants, even after the switch, there was mounting evidence that this water was unfit to drink, that it was toxic. Even immediately after the switch, Flint residents were complaining about the odor, the smell, the taste of the water. And then you have independent third parties like Mr. Del Toro of the EPA and Dr. Mona Hanna-Attisha who tried to raise the alarm about the risks of continuing to consume this water. And the complaint alleges that the MDHHS defendants worked to discredit this evidence and then proactively made false statements about the safety of continuing to drink this water. The complaint quotes emails where MDHHS employees are referring to the situation in Flint like a third world country and wondering maybe if the federal government will step in. Even after the MDHHS defendants confirmed Dr. Hanna-Attisha's findings, they sat on that evidence. They even developed a talking points memorandum that gently admitted Dr. Hanna-Attisha's findings but then said that lead paint was more of a problem than Flint River water. I'm not disagreeing with anything that you said, but the problem is the switch is in April of 2014. Dr. Mona got involved, as I understand it, in the fall of 2015. So that's what, 15 months later? That's correct, but even prior to Dr. Mona's study, there were other objective indicators that the water was unsafe. You have the General Motors decision in October of 2014. General Motors ceases using the Flint River water at its engine plant because of fears that the corrosive nature of the water and the chloride in the water would corrode metal parts. And that was a very public thing in Michigan, Your Honor. It was a public news story through press releases, and yet defendants saw no need to alert the public that water that is too corrosive for metal parts is not safe to drink. Instead, you have defendants like Defendant Prisby, who writes an email to the other defendants saying that Flint River's levels of chloride, although not optimal, are satisfactory. And he stresses the importance of not branding Flint's River as corrosive from a public health standpoint. And you have other things other than that. If this is just simply bad judgment, what do you have to support its unconstitutional conduct? Your Honor, this is not just bad judgment. Like I was saying before, the events here unfolded over a period of years. So the complaint alleges that the defendants had actual subjective knowledge that the Flint River water was not safe to drink, that they were deliberately and indeed callously indifferent. Let me stop you right there for a second because interestingly enough, as you know, you've got a panel that's all Michigan judges here. We've lived through this too, even though none of us live in Flint. So I think everybody in America has probably seen the newscasts of people showing up as city councilor in the mayor's office with these jugs of brown water. So there's no question that something was amiss with the water. I mean, nobody could argue about that. But this is a specific claim involving lead. And there's suggestions in the briefing about Legionella, but you're not really representing Legionella people as I understand it. This is lead. So we're trying to figure out when did people know that there was lead in the water or when should they have known there was lead in the water and then what duty did they have to do something about it. If they had a duty to do something about it and they didn't, did that violate somebody's constitutional right, at least the way I see it here. So that's why we need to be more specific about this. Yes, Your Honor. And as far as when they knew, I'll address the question of when they knew and then the separate question of whether they had to do anything as a result of that. So the complaint talks about a 2004 study of the Flint River as an emergency intake and found it to be highly sensitive and susceptible to contamination. Then you have another 2011 study which is a feasibility report which studied the use of the Flint River as a primary water source and rejected it as a viable source. It also found that the estimated cost of preparing the Flint water treatment plant to treat Flint River water in compliance with applicable drinking water standards was in the millions of dollars. So you have the 2004 study, you have the 2011 study, then you have the year leading up to the transition to the Flint River when the MDEQ and the Flint defendants were evaluating the viability of the Flint River as a water source. But if the plant had been properly equipped to treat the water, then none of this would have happened, right? I think that's right, Your Honor. So while this is transpiring, this is another thing that I don't really understand. There are engineering firms that are involved in all of this and you have sued several of these engineering firms, if not in this case, then in other cases. My understanding is you're alleging the engineering firms were negligent in the advice that they were giving to the decision makers, right? That's your claim. Generally speaking, that's correct, Your Honor. So if these decision makers are relying upon an engineering firm that presumably had the expertise, but now you're claiming in other cases proceeded negligently, then how does that make them deliberately indifferent? Even though, looking back in hindsight, reliance upon that engineering firm's advice apparently went horribly wrong. I'm sorry, Your Honor. Are you asking if the engineering firms were deliberate? No, no, no. You're saying that there was a lot of knowledge there were problems with the river, people knew the water had to be treated, but there's an engineering firm, as I understand it, that gave advice that the plant could properly treat the water, right? That's correct. And in another case, you're alleging that that advice was given in violation of their professional engineering duties and was negligent. So what I'm trying to figure out is if people that were making the decisions relied upon that engineering firm's advice, how were the people that relied upon that, that don't know how to run a plant, deliberately indifferent to somebody's constitutional rights? Well, Your Honor, the complaint alleges that the defendants actually knew, that they had actual subjective knowledge, that A, the Flint River was not a viable source of drinking water, and that B, the Flint water treatment plant was not prepared to begin treating that water on a continuous basis. And I'll just give an example really quick. So basically the engineering firm didn't tell them that it was okay, or they did and they shouldn't have relied upon it? Well, what you have with the engineering firms is that they were definitely negligent in the advice and their involvement in trying to treat the water corrosion. But despite all that, what you have is you have other factual allegations in the complaint that show notwithstanding whatever advice they were given from the engineering firms, they also had actual subjective knowledge as to the viability of the Flint River as a water source and as to the Flint water treatment plant as not being prepared to begin treating that water. I don't get what the phrase actual subjective knowledge means. What is that? What it means, Your Honor... They had actual knowledge or they didn't? Right, so it's subjective as opposed to an objective standard, as opposed to saying that objectively a reasonable person should have known in their position that the risk that they were causing to Flint's residents or the risk that the Flint water treatment plant was not prepared and not online to begin treating the water. So that is closer to a negligence standard. When I'm talking about actual subjective knowledge, I'm referring to the defendant's deliberate indifference, meaning that they knew about the risks, they knew about the harms that their actions were causing to Flint's residents, and they acted in deliberate disregard to that over a period of months, if not years. And just going back to your other question, I'll just give a couple examples. With respect to Defendant Bush, he's the District Supervisor assigned to Lansing's District Office of the MBEQ. The complaint alleges on page 23 that despite stating on March 24, 2014, that the Flint water treatment plant was set up for emergency use and not prepared for continuous operation, a month later in April 2014, he emails Defendant Werfel to provide talking points for an upcoming Flint meeting, stating that the department is satisfied with the city's ability to treat water from the Flint River. And the complaint alleges that that was knowingly false. And am I right, just again in sort of the global picture here, that the state defendants, and I'll lump them all in together just for convenience here, believed, apparently in hindsight incorrectly, that under the lead and copper water rule, if there did turn out to be lead in the water, that you ran the plant for six months and you tested it again, and you ran it for another six months and you tested it again, before you came up with a course of action. That's what happened here, isn't it? Well, what the complaint alleges is the defendants knew that the water was not being treated in compliance with the lead and copper rule in the State Drinking Water Act. But, can you answer the question? Are you saying they knew it, but they thought they didn't have to? I thought the problem here was, and it seems silly to even state it this way, but it seems as if, if you assume that they knew there was lead in the water, and they knew that the plant wasn't treating it correctly, and even if they knew that lead was harmful, that they believed that under the rule, that the course of action wasn't to require the city to begin to treat it immediately, because there was a question apparently about how to treat it. So, the course of action they thought federal law required was to wait six months, test it, wait another six months, test it, then decide what to do. That's what they thought, right? Well, Your Honor, what the defendants thought, originally, remember that the Flint River was intended to be a temporary source of drinking water. So, that Flint would switch, it would transition from the Detroit Water and Sewage Department to the yet-to-be-formed Karangandi Water. So, initially, the Flint River water was intended to be a temporary source. So, what the defendants thought was that it wasn't worth it to complete all the upgrades on the Flint Water Treatment Plant, or to adequately study the water, because they would be transitioning to another source within a year or two. But even the EPA, as I understand it, has admitted that the rule was not clearly drafted and needed to be revised to make it clear you don't wait six months and a year while you're pumping lead into people before you take corrective action. I know I'm generalizing, but am I saying that incorrectly? So, Your Honor, if I understand your question, are you asking whether the lead, copper rule, and safe drinking water were sufficiently clear? Well, maybe, but basically these regulators believed, correctly or incorrectly, that they had a duty to follow the EPA law and regulations. And as I understand it from reading all this stuff, they thought, I'll bet, incorrectly, they were following it incorrectly, were following it correctly, because it didn't require immediate treatment of the water. Now, just saying that seems stupid, but that seems to be what everybody says happened here. Well, not quite, Your Honor. What the complaint alleges is that the defendants knew that there was a need to have corrosion controls in place prior to the transition to the Flint River. And they knew that those corrosion controls were not in place at the time of the transition. But the engineering firm said that the plant was okay to treat the water. Well, Your Honor, what the engineering firm... Yes or no? What the engineering firm said is not really part of the limited issues on this limited interlocutory appeal, or whether the defendants' reliance on that was reasonable. These are ultimately questions of fact, which are better left for the summary judgment stage after there's been an opportunity to evaluate whether it would have been reasonable or not for the defendants to rely on. I didn't ask you whether it was reasonable to rely on it. I asked you what did they say, and you didn't want to tell me, so I get that. Well, Your Honor, what the complaint alleges is that the defendants knew that the Flint River water was not being properly treated, that there were not proper corrosion controls in place. And this is true of all defendants? It's true with respect to the defendants that those allegations apply to. So these allegations are primarily directed at the MDEQ and the Flint defendants who were responsible for not only the decision to switch, but also to ensure that the water was properly treated after the transition. And there are numerous allegations throughout the complaint to support this. You have a task force put together by Governor Snyder, who found not only that the MDEQ failed to properly monitor or test Flint River water to ensure compliance with the safe drinking water and the lead and copper rule, but they also found that the MDEQ seems to have been more determined to discredit the work of others who ultimately proved to be right than to pursue its own responsibility. So is there a constitutional violation that arises out of one regulator or however many there were trying to discredit somebody else? Is that a constitutional violation? In this situation, yes. What you have here is... And where do we look for cases for that? I mean, I understand about the switching, I understand about knowing you should have been treating the water, I get that. But discrediting somebody that's saying there was a problem with the water, that is also a substantive due process bodily integrity violation. Here it is, Your Honor, because... What is the bodily integrity subpart discrediting violation? Here it is a bodily integrity violation because the defendants knew the risk that their affirmative actions were imposing on the plaintiff's bodily integrity. They knew about the risks of continued consumption of lead. And, Your Honor, the allegation is not simply that they tried to discredit outside sources. It's that they lied. They made knowingly false statements to others within their department, to the press, and directly to the members of the public. So the allegation is not... There's only maybe three or four of this whole group that actually made any statements to the press or to the public. Is that right? No, it's definitely... They all did? It's definitely the majority of the defendants. And many of those statements are quoted throughout the complaint. Okay, I'll look. I'm extending your time. I apologize. But, Your Honor, I just want to go back to your previous question about, so where do we look when we determine whether there was a constitutional violation under these circumstances? Under the clearly established prong, a reasonable official can be on notice that their conduct is unconstitutional in a variety of ways. So in our brief, we cite numerous Supreme Court and lower court decisions that involve analogous bodily integrity violations to those that have occurred here, where poisonous substances were involuntarily introduced into individuals' bodies without their consent, and where the ones introducing those substances lied about the safety of those. But how do you link them together? I mean, you've got Flint and maybe some MDQ responsible for introducing the substance. How do you get the other people in? Well, Your Honor, the complaint does allege that the defendants are jointly and severally liable. What you have here is a situation where the whole is greater than the sum of the individual parts. Joint and severally liability under Section 1983? Maybe there is. I've never heard anybody say that. I believe there is, Your Honor. Now, it's true that each individual's actions, when looked at in isolation, probably would not have led to the entire Flint water crisis unfolding as it did. But what you have is individuals' actions combining with the other defendants' actions, which caused the situation that we now have, where four years later, Flint residents still do not have clean water. Well, that's a fascinating concept, because I've never heard anybody say that somebody can be liable under Section 1983 because they did something that in and of itself doesn't violate anybody's constitutional rights because parties B, C, D, and E did something that then collectively violates your constitutional rights. So is there a case that even hints at that sort of analysis? Maybe I misspoke, Your Honor, because that's definitely not what I was saying. What I was saying is that each individual defendant's actions looked at in isolation do constitute a bodily integrity violation. Okay. You're talking about causation, that some parts of all the actions caused the injury, as opposed to no violation. That's the way I interpret it here. Okay. For people that are monitoring, how do you differentiate them from the third-party cases where they're monitoring and they're not doing a very good job, but they're still not liable? I mean, you're trying to treat them as the same person as the MD2 people or the Flint people. Well, Your Honor, when you're talking about monitoring, are you referring to the line of state-created danger cases? Because what we have here is we have a complaint that alleges that each of the defendants individually made affirmative acts that violated the plaintiff's rights to bodily integrity. Now, the complaint did plead a count in the alternative under the state-created danger theory, but that's not at issue. We're not talking about that. At least, I don't think we are. But for, let's say, Wells and Lyon, in essence, right, you want to hold them responsible. I mean, the harm or the constitutional violation that you're describing is this involuntary bodily invasion of poison, right? That's correct, Your Honor. Okay. And that happened because of the water switch. Now, how do you get the defendants who weren't involved in that to be responsible for that violation? So how do you get Wells and Lyon and some of the others, Peeler, why are they responsible? Sure. And I'll just respond with some specific examples with respect to those three individuals. But it's not just what they did. We need to know why that makes them liable. Well, Your Honor, it is because what they did, their actions... Well, say what they did, but also say why that leads to liability. Absolutely. So, starting with just Defendant Peeler, who, like Your Honor said, is an MDHHS employee. Just one example. Despite Defendant Scott, who is a fellow MDHHS employee, having told her that his own review of blood lead level data showed an increase post-switch to the Flint River, Peeler sends an internal email saying, My secret hope is that we can work in the fact that this pattern is similar to the recent past, indicating that she wanted to dilute and suppress the department's findings by attributing the blood lead level increase to seasonal variations. Now, what makes this rise to the level of a substantive due process violation is that this was not mere negligence. This is not a mere omission. This is somebody who made this statement knowing that as she sent this email, Flint residents' lives were being put at risk because they were consuming lead-laden and bacteria-laden water. And this statement and others which are quoted in the complaint are made in callous disregard to the risks... I understand, but where is the constitutional violation? Because what it sounds like is that you're talking about these are regulators or people charged with monitoring certain health risks that intentionally and outrageously didn't do what they were supposed to do. But I'm not sure that that is a constitutional violation. What's the violation? So the violation, Your Honor, is the violation of the right to bodily integrity, which is a component of substantive due process rights. And what that protects against is a government actor who interferes with an individual's bodily integrity in a way that shocks the conscience. Now, you can meet the shocks the conscience standard in multiple ways. You can either meet it through, for example, arbitrary government action. You can also meet it through conduct which is deliberately indifferent. And the complaint alleges that these defendants acted both arbitrarily and in deliberate indifference to the risks to plaintiff's bodily integrity that their conduct was posing. Because of the fact that the defendants, including the MDHHS defendants, not only did they fail to disclose information, not only did they commit many omissions, they chose to act affirmatively to put plaintiffs in harm's way by making knowingly false statements to the public, to others within their department, and to other government officials who were responsible for preparing press releases. And right now you're lumping a whole bunch of people together, right? Well, I was just answering your question more generally, but I'd be happy to go back to discussing the individual allegations about the particular MDHHS defendants. How is this different from the question whether, and I know you're not alleging that there's a right to clean water, but given that the government is the one who's supplying the water, how is this different from a claim to a right to clean water that's coming into your home? Sure. So I think a good hypothetical that would present a right to clean water would be a situation where you have say a lake or a pond, and it's not water that's being pumped directly into people's homes. Now let's say it's just part of a nature reserve. In that situation, if the government were polluting that pond and the plaintiffs attempted to challenge the pollution practices, that would be an assertion of a right to a clean environment, saying we have a right to enjoy, say, the beauty of this pond. That's not what this case is about in any sense. This case is about water that is being pumped directly into people's homes, water that defendants knew would be used for drinking, for bathing. Are you saying then that you have a right to have clean water pumped into your home? No, Your Honor. That's not the right that we asserted in the complaint. It's not the right that the district court's decision is founded on. So I'm asking you to tell me the difference. Your Honor, I would characterize this right as being in line with the long line of both Supreme Court and lower court decisions recognizing that an individual's bodily integrity right protects against government officials who knowingly introduce poisonous substances into those individuals' bodies without their knowledge or consent. So as Judge Griffin was saying earlier, it's analogous to the radiation experiment cases. There's others like those, like the plutonium experiment cases or some of the others. So if they, if day one when they realized that the color, that something was wrong, if they immediately put out all sorts of bulletins that said the water's not safe, don't drink the water, you know, don't even boil the water, we're going to get everybody water, then you'd say, would that be a violation? Your Honor, if that's what defendants had done, this would be a much different case. And I think it would be a much harder case for us to be honest, because if the defendants had told the public about the risks of the Flint River water and continuing to consume that water as opposed to... So it's the involuntary, it's forcing the involuntary consumption of the poisons. Correct. Mr. Gessie, you've been way out of time. Can I just ask one more question? Sure. So just to make sure that I understand where all of this is going. The end result, I think, of your discussion with Judge White is that it's because they needed to rely upon water to live and the city chose to deliver them water and the water was contaminated. But there are lots of other things that we rely upon. We rely upon food and air and avoiding plagues and those kind of things. So I just want to make sure that I understand rightly or wrongly that if you're right about this, if a regulator is in charge of air quality or food inspections or preventing plagues or something like that, if they violate their duty as a state employee, that doesn't just violate state law and maybe some federal law like the Federal Clean Water Act or something like that. All of those things then, it seems to me analogously, would be exactly the same as this claim and would constitute constitutional violations of the rubric of substantive due process and bodily integrity. Because all of these things that I'm mentioning are all being taken into your body in some way. Am I right about that? No, Your Honor. Why not? Because in order to make those situations more analogous to this case, say, for example, it's CDC, an obligation to prevent diseases. In order to make something like that analogous to this case, you would have to have a CDC official who literally went into people's homes and left bacteria, left traces of diseases that he knew were contagious and that would be controlled. Why? What if the CDC knows that there is bacteria in the water and they don't tell people? That's a violation of bodily integrity if you then drink the water under your theory. Well, it might be, but in order to… The point is there could be a violation of constitutional rights by state employees by not acting properly in connection with any number of different things that are in some way enter your body. Right? No, Your Honor, because… It's just water coming from an admissible source, that's all? No, I think in the examples you gave, I think one of the ones was air pollution. If you had a government-operated plant that was simply releasing pollution into the air, a decision in our favor here would not necessarily implicate the Constitution in that situation. Again, what you would have to have is you'd have to have government officials who knowingly and affirmatively put individuals in harm's way. So you'd have to have a government official that maybe took that polluted air and pumped it directly into an individual's home, as absurd as that might sound. That is what happened here. You have government officials who affirmatively… I don't mean to cut you off, but I get it. Okay. So, Your Honor, I understand… You could just wrap up and… Absolutely, I understand I'm out of time, but in closing, I just want to make one point and just emphasize the procedural posture of this case. This case has come before the court on an interlocutory appeal, limited interlocutory appeal from the denial of motions to dismiss. Defendants obviously wish to contest the complaint's allegations, and some of the arguments that I've heard today misstate the complaint's allegations. We accept all the plausible allegations in your complaint. They cannot appeal the facts on this interlocutory appeal, and this motion to dismiss stage is whether we go to trial or not, right? That's absolutely correct, Your Honor, and the limited issue is just whether the complaint establishes a violation as possible. I have one more question. Which of the defendants do you think are most removed from the constitutional violation? Which are most removed? Yeah. As to which is the bodily integrity claim the iffiest? Well, if I may, Your Honor, I would refer to one of the defendants who's actually not party to this appeal. It's Defendant Glasgow, who is an MDEQ official, and the judge actually dismissed the bodily integrity claim against him because there was actually a statement in the complaint where he said that if the transition to the Flint River is made and if the Flint water treatment plant is used to treat that water, it will be against my direction, and the district court found that because he had actually pushed back against other people in his department about the transition and attempted to raise flags that the complaint failed to state a claim against him. Now, I'm not saying that we agree with that. I think in an amendment we would include additional allegations and attempt to plead a claim against Mr. Glasgow, but I just raise it to draw a distinction. So you're saying you really don't want to answer the question, basically. Are you asking specifically about which of the defendants on this appeal? Yes. Which group of defendants? Why would we be asking about somebody that's not before us? Well, Your Honor, he was a defendant, like I said, in the case. Just answer a question. Which defendant is least culpable? Not least culpable. Which defendants are furthest, if you're looking at a spectrum of the bodily integrity claim? I mean, some are more immediate, I think, and some maybe are less immediate when you look at the constitutional analysis, but maybe you disagree. I don't know. Your Honor, just in response, I would have to say, if you're asking for a category of individuals who are most removed, I think out of the three that I've identified, it's probably the MDHHS defendants who are most removed because it was the MDEQ and the Flint defendants who are responsible for the switch and responsible for treating the water. Having said that, I do, looking at the complaints and allegations, there are sufficient allegations to state a bodily integrity claim against the MDHHS defendants as well. All right. Thank you, Mr. Kesky. Thank you. Thank you, Your Honor. May it please the Court. I'm Sam Bagenstos, and I am representing the amici who are the plaintiffs in the consolidated Henry Flint water cases. We're here because the resolution of these constitutional claims may well be important to our underlying claims in the district court, and let me just say a little bit about that. In the district court, many, not all because not this one, but many of the class action cases involving the Flint water crisis have been consolidated in this single action. It's been appointed by Judge Levy for those actions. The consolidated actions include a due process bodily integrity claim, but also include claims that aren't at issue here, such as an equal protection claim, and interim lead counsel as well as interim liaison counsel for the individual plaintiff actions have been referred to court mediation by Judge Levy. I have nothing to report about the results of that at this point, but this court should know that that's what's going on. I'm happy in whatever time I have to answer whatever questions the court has. I think it might be useful just to start with, and kind of pulling together some of the questions Judge McKee and Judge White asked, to kind of pull together what I think of as the concentric circles of liability in this case. I've heard a lot of questions about there are a lot of different kinds of conduct here, and it is one big Flint water crisis, but how do we parse the constitutional violations against each of them? I think it's useful maybe to think about it in this way. At the very core, we have the decision that's made to switch to the Flint River, a decision that is made at least in the beginning in April 2013 is accomplished in April 2014. As evidence accumulates, including Glasgow in particular, putting his supervisors, Early and Croft, who are defendants here, on notice that the Flint water plant is not ready, they rush to force the change to the Flint water plant and the Flint River. That is the most core element of liability here. I think that's the thing that people have spent the least amount of time on in this argument. One concentric circle outward from that, not really that different, is... Are those all Flint defendants? So Croft and Early are Flint defendants. There were also, if you look at our brief, we try to detail in our brief, amicus brief, all of the evidence here. There were also a number of MDEQ individuals who were involved in that initial decision, and so they're also implicated in that count, but it was Croft and Early who forced the change most consequentially. One step out from that, but really not... Now, is there a contention that they knew at the time that the water plant couldn't treat this water? Yes, there is that contention. In fact, that's what Glasgow specifically said. He said, you know, if this change is made in April, it's over my direction. They knew, and there are extensive allegations in the complaint about this, they knew that when the plan was hatched to move to the Flint River and to use the Flint water treatment plant, that prior studies had shown it was necessary to engage in several significant upgrades to the Flint water treatment plant and that they had not been done at the time. So, yes, that allegation is in the complaint. Obviously, there may be factual disputes about that, but as Judge Griffin pointed out, that's not what we're doing here. So, one step out from that is the decision made in particular by Defendant Ambrose, one of the emergency managers, not to switch back, and it's not a mere omission because he had in front of him two occasions, in January and in March of 2015, after a great deal of evidence of corrosion, including Legionella, and I can explain, Your Honors, why Legionella is important even for the, we have a Legionella claim in the underlying case, but even in a lead-focused case, Legionella is relevant to putting him on notice, but of lead poisoning of Legionella and of corrosion, notwithstanding all of that, in January and March of 2015, Defendant Ambrose made the decision to reject the offer of the Detroit Water and Sewer Department to switch back to Detroit Water, even with the waiver of the reconnection fee. In fact, in March, he overrode a 7-to-1 decision of the Flint City Council to that extent. So, that's compounding the original decision. That's a consequential decision, and that's a decision that was made, not just with the prediction that the Flint water treatment plant wouldn't be ready, but also with extensive evidence of corrosion having arisen through the succeeding several months. Then there's an outer circle of liability here, and I think it's possible to map individual defendants within that outer circle, probably in a way that I can't do here. This isn't a closing argument in a trial, but the outer circle of liability is the people who, by their public statements or by their statements to regulators, ensured that residents of Flint would continue to drink the poisoned water for months longer than they otherwise would have had to, and that's the false statements made by Bush. I think Mr. Bush, when he was up here, read, I think through an oversight, the wrong allegation of the complaint. The relevant allegation of the complaint is actually paragraph 152 that says, On February 27, 2015, in response to concerns about extremely high levels of lead in a resident's water sample, Defendant Bush told the EPA on behalf of MDEQ that the Flint water treatment plant had an optimized corrosion control program. So, Your Honor, Judge White, you were correct about that, despite the fact that it did not. If you read the succeeding allegations, they allege that he knew that that was not true. So it's Bush, but it's also the other individuals. It's when the del Toro memo is sent to the state of Michigan. It's the MDEQ individuals pushing back on that, trying to defend their position of not having an optimized corrosion control program. And, Judge McKeague, I want to get back, if I might, and I know I'm begging the Court's indulgence to go over my red light here, to the question that Your Honor asked about what was the position of the defendants with regard to what they were supposed to do about corrosion control? Because I think, Your Honor, you were correct that many of the defendants in this case took the position that the Safe Drinking Water Act did not require the use of corrosion control until those two six-month periods. That's correct. And actually, in the Bowler and Mays cases, in which I was also appellate counsel, we litigated the question of, well, if that's what they thought under the Safe Drinking Water Act, does that resolve the constitutional claims? Ultimately, this Court said, no, the constitutional claims can proceed separately. They may have thought the Safe Drinking Water Act allowed them to do what they were doing. But the question is whether, given the information they had, beginning almost immediately with the discolored water, which is a sign of corrosion, and then with the fecal coliform, and with the Legionella, and with the signs of lead poisoning, and with GM, and with the University of Michigan-Flint finding lead in their water, and with the Michigan State Office Buildings deciding not to use the water in their office buildings in Flint, given all of that, could they have still thought that it was appropriate to not use corrosion control? And obviously, we would suggest, and these are facts that will have to be litigated, we would suggest the fact that Bush made a false statement to the EPA that they were using corrosion control suggests they might well have understood that they had to. Whether under the SBWA or simply out of their obligations to the bodily integrity of the residents of Flint. So essentially you're saying that one of MDEQ's charges is to implement the EPA's requirements and the federal law requirements. They're sort of the first line of defense here on contaminated water, right? So basically what you're saying is even if they thought that what was happening was consistent with federal law, they then still had an overriding constitutional duty that they should have known they were violating, even if they thought they were in compliance with the law that they're charged with enforcing. Is that basically the argument? Well, I think it's important to – so yes and no, and I think it's important to separate out the sets of defendants here. So when you're talking about the municipal defendants, the people who are operating the water system, they had a constitutional obligation and a statutory obligation. Those are parallel obligations. Discharge of one does not necessarily discharge the other. And when they have evidence – But the interesting part is you're saying the law was clearly established that they couldn't violate the right to bodily integrity, while at the same time they thought, correctly or incorrectly,  Well, I think – and this is one of the things we litigated in the Bowler Maze cases. I mean the Safe Drinking Water Act itself is very clear that it does not cover all of the possible harms caused by water. So no reasonable official would think merely by complying with the Safe Drinking Water Act that they had complied with the Constitution. And so I think it's really important to separate out these two different things. Here we had not just a general point, not just a probabilistic guess about what would happen. We had actual evidence of what was coming in over the months following the switch. And over the months following the switch, what we found was extensive evidence of corrosion in the pipes leading to legionella, leading to fecal coliform, leading to the trihalomethane infestation or trihalomethane contamination, leading to many things that put these defendants on notice. Now the NDEQ defendants I want to get back to because I said it's important to separate out these defendants and I think the panel has been working to separate out these defendants. The NDEQ defendants, I think it's important to note, they're not being alleged to have violated the Constitution here merely for not following up on something, merely for not enforcing the Safe Drinking Water Act. They're being alleged to have violated the Constitution for their false statements made to the public and to the EPA that extended the period of time in which people in Flint were drinking poisoned water. And those false statements, you know, it's one thing to say we're complying with the Safe Drinking Water Act. It's something else to say the water is perfectly safe. These people who are coming in front of you to tell you that there's lead in the water or lead in people's bodies. Lead in the water was Dr. Edwards. Lead in people's bodies was Dr. Hanna-Attisha. These people have an agenda of their own. They're not telling the truth to you, which is essentially what's alleged here. What's the best case to say that false statements also violate the right to bodily integrity? I think we actually have two different points here, and I think the best case actually may be a case that the defendants cite, which is the Lombardi case, because the Lombardi case, which is the post-9-11 case about false statements by the EPA, finds no liability but says, shocks the conscience, applies here. So they're applying a constitutional analysis. That's an inference from Lombardi, I guess. Yeah, so you can do the work after that. But that's what I would say is probably our strongest case for that set of defendants. Thank you, Your Honor. I'd like to circle back. We've been focusing on the individual defendants, which we have to do, because they're each treated individually here. But the big picture, as Mr. Birch started out, was whether there is a clearly established right of violation of bodily integrity under these circumstances at the time of the violation. He says there was not, and if there was not, that's the end of the game. We don't have to look at everybody individually. If the overall picture, there is no violation, that is clearly established. And I think he started out by saying it was not clearly established. Give me your best authority in support of your position that it was clearly established at the time the defendants took these actions. Yeah, so I think the authority, there's no case that's right on point. I think we all acknowledge that. Does there have to be? No, and I don't think there has to be. How close does the case have to be? I think it's useful to explain what this analysis is doing. The point of finding a case that's close on point, it's not an academic or intellectual exercise. That's precisely the view that the Supreme Court rejected in the Lanier case when it reversed this court. What this is about, and the Supreme Court said it and this court said it many times, is determining whether there was fair warning to the defendants about whether their conduct violated the Constitution. As the court put it in Anderson v. Creighton, in light of preexisting law, would the constitutional violation have been apparent to a reasonable official? That's really the question. Sometimes, with some kinds of claims, we have a need for a very close on point kind of case, particularly claims that are highly fact-dependent, or claims that are at the edges of the law. I think Judge McKeague talked about Hope v. Felser in the first half of the argument. Hope and Lanier, as well as some of this court's cases interpreting those decisions, Hope and Lanier show and hold that when you have something that is a clear violation of preexisting, even general principles, you don't need a close case on point. I think that in recent anti-irradiation cases, highlight the fact that we can have an invasion of people's bodily integrity without actually physically forcing something into them by touching them, by pushing it into them. It's clearly established, I think, as soon as the city of Sacramento v. Lewis, as well as Awalski in this court in 2002, that when there is an opportunity to deliberate and you have a constitutionally protected interest at stake, and some of the discussion has kind of melded together these two different points, the constitutionally protected interest in bodily integrity, which I think Cincinnati radiation shows we have that interest here. It doesn't matter if you push somebody right next to them or shoot something into them from a distance away, their bodily integrity is affected. There's still not liability unless we can show that the defendants acted in a way that violates the Constitution, and that's Lewis and Awalski, that show us that where there's an opportunity to deliberate and the state official acts with deliberate indifference. So the state official knows that there is a serious risk of substantial harm and acts with callous indifference to that. Then we have a violation, and that's been clearly established for a long time. I think it's important to have those two pieces of the argument as well, those two pieces of the analysis in view as well, because I think it answers some of Judge McKeague's concern that it is what we're doing here essentially saying to state officials, if you don't do your job so well, if you don't violate state law, if you don't comply with state law or federal law, is there also a constitutional violation tacked onto it? The Supreme Court in cases going back to Daniels v. Williams in the 1980s and on and on through the city of Sacramento v. Lewis has said that the way we keep due process from being just tort law or just replicating state law duties is we impose this higher requirement of a mental state. Here deliberate indifference is a serious mental state. I mean we don't have a case that's like this because we don't have a case of public officials with all of the knowledge they had here making consequential decisions, and they're actions not omissions, consequential decisions that led to poisoning of an entire community. That's why we don't have this case. The culpability also has to rise to a level of shocking the conscience. Right. It has to rise to a level of shocking the conscience, and what shocks the conscience, this court said in Nowalski, depends at least in significant part on time to deliberate. It also depends on what is the kind of harm, but yes, it depends on time to deliberate. I'm sorry. Just one quick follow-up. Please. It seems to me in reading these cases, so this is where I want you to give me your reaction, that when we're trying to figure out how close a case has to be, this is sort of Mr. Burch's template argument, that the court seems to have a fairly consistent approach when you're talking about Fourth Amendment, Fifth Amendment, Eighth Amendment, and probably race claims. We get a little bit hung up on whether things were really fast-moving in connection with excessive force, but there's a body of law there. To take that body of law and then impute it to substantive due process bodily integrity seems to be problematic in the sense that the Supreme Court seems to be very reluctant to expand substantive due process in general and bodily integrity in particular. So that's sort of a statement leading to a question I want you to respond to. Do we apply the same close enough analysis that we do in these other areas when we get to substantive due process and bodily integrity? I think if we had a case that were really at the periphery of the bodily integrity question, then I think we would have concerns running along those lines here. That's the most candid answer I can give you. I think what we have here, when we talk about substantive due process, it obviously covers a very wide waterfront. We're talking about when the court says we're hesitant to expand substantive due process, sometimes we're talking about marriage issues, as some people in this courtroom know, but sometimes what we're talking about is these very core questions about whether something is going to be put into your body that you don't want to have put into your body, and that's been a core understanding of what due process protects or due process liberty protects for a very long time. If one of these city officials had made the decision maliciously to poison everyone in the community, I don't think we'd say that's a stronger case on the mental state than here, but we wouldn't say that's just categorically different in terms of whether bodily integrity is an issue. I think because we're at the core of bodily integrity and because the Supreme Court has said, Sacramento v. Lewis, they actually had a pretty extensive fight between the majority and Justice Scalia in dissent about this precise question, how far do we extend substantive due process? And the majority says, when we're talking about arbitrary executive action, shock the conscience is the test, and time to deliberate is crucial to determine what shocks the conscience. And you're saying that the HHS defendants can be liable if their conduct shocked the conscience, and it doesn't matter how even though it's regulatory and they weren't involved in getting the poison to the people. I think if we can prove, and this is the allegation, but if at the end of the day what the plaintiffs can prove is that the MDHHS defendants, by their actions, and not just omissions, but by their actions, which were taken with deliberate indifference, extended the period in which people were drinking poison water that invaded their bodily integrity, then they'll be liable. Okay, but it has to be really almost proactive action taken almost for that purpose. I mean, it has to be beyond they didn't do anything. It has to be beyond they didn't do anything. They had to have knowledge and callous indifference. That's what deliberate indifference requires. And I think that's really important in guaranteeing that there is this line between people mess up on the job. They're not constitutional violators. They have to really mess up. It doesn't have to be intent unless we're in one of these fast-moving situations, which this was not. But deliberate indifference is a significant standard, yes. And if the court has no further questions. Further questions? I don't think so. Thank you, counsel. Thank you very much.  Mr. Vottle. Thank you. And I appreciate your patience with this complicated case. Judge Griffin, I want to start with your reference to the in-ray Cincinnati radiation case because the facts of that case were that the defendants actually designed and implemented the program to push all this radiation, massive amounts of radiation, into the plaintiff's bodies. In this case, it's a failure to regulate from the perspective of the DEQ and MDHS. Well, they supply the water to the plaintiffs. They don't supply the water. Flint supplies the water. Flint made the decision. We have the Flint emergency managers in the case, don't we? Right, but that's not the DEQ defendants. Oh, okay. All right. I recognize your defendants are a little different from the others. Correct. But the overall picture is that, I mean, they claim that what happened was the water went to the plaintiffs. Yes, but I'm going to use my limited time to focus on my defendants. The Cincinnati radiation case is a Southern District of Ohio District Court case. It is, and so we wouldn't look to that as clearly established. That doesn't make it clearly established, does it? Correct. Does it not make it? Okay, that's a question. It's a district court decision? It is a district court decision, yes. If there's a district court decision on point in the Sixth Circuit, we don't look at it to see whether it is? The Supreme Court says you look at decisions of the U.S. Supreme Court and this circuit, first of all. In a rare case, you might look outside those sources. Okay. I thought they said then you looked at other sources, too, and it may not have the weight. There are four sources, and the Supreme Court has never said you look to a district court decision inside or outside. What they're suggesting is you might look to another circuit decision. But I think if there's a district court in? It's not an Eastern Michigan. Maybe if it was the Eastern District of Michigan, maybe. Maybe. But the point is that for purposes of the DEQ regulators and the MDHS officials, they didn't own the water. They didn't make the decision to switch. They didn't regulate the quality. They didn't regulate the lead pipes that were in the system. They certainly didn't inject lead or any other substance into the water. It's completely different. And what the U.S. Supreme Court said in Descheny is that in a substantive due process case, it's not enough to allege a failure to do something. You have to be the actor, and that makes this very, very different. Now, this point really came through in the colloquy between Judge McKee and the counsel for the plaintiffs because he brings up the CDC hypothetical, and then he gave his own hypothetical about air pollution. And in both of those cases, the government official actually did something affirmative to put the poison there. In the CDC hypothetical, he said the official would actually have to leave the bacteria in the home. With the air pollution case, he would actually have to pump it into their home. But with respect to the DEQ and MDHS officials, they weren't doing the pumping, the injecting, any of those sorts of things. It's completely distinguishable. But the DEQ was involved in the decision to switch, wasn't it? They had the regulatory approval. Yes, they were on the back end. But that's different than actually pulling the switch. Ironically, when you asked about which defendant is least culpable, he points to Mr. Glasgow, who was dismissed from the case. Well, even though he's the one who pushed back to some extent to his Flint superiors, he's actually the one who said, okay, let's go ahead and do it. And yet, he's out of the case, and the DEQ officials who are sitting at their desks trying to evaluate what to do are the ones who are still in. So if you look at the cases that actually have templates, we've discussed at length the Branch case. That's out of New Jersey. You've also got the Koshow case. That's the California Court of Appeals decision that we discussed. There, the officials affirmatively put a contaminant in the water that the plaintiffs didn't want to ingest. And even there, there wasn't a clearly established right. Okay. Mr. Mercer, you're out of time. Any further questions? No. Could I? Just 10 seconds? Sure. They lied about it. The allegations don't support that. But if you look at the Lombardi case in the Second Circuit, there it was alleged and conceded that federal officials lied about the air quality in New York City after 9-1-1 and intentionally put responders in harm's way in air that they knew was polluted, and yet still there was qualified immunity because there were countervailing government regulatory considerations. Thank you. Mr. Caffey, one minute rebuttal. Is that what I saw? Or no, Mr. Berg, I guess. Is it? Thank you, Your Honor. I think he misused it. I have very little to say, just a couple of corrections to the record. Mr. Croft was the Director of Public Works. Mr. Glasgow, unlike what Plaintiffs' Counsel said, was an employee of the city. He was not an MDEQ employee. He was the Utilities Administrator at one time and a lab tech at another time. So those are just corrections to the record. With respect to the city and its position as to whether or not it was in a position to have a liability, in this case under a constitutional violation, as the Court asked a number of times, doesn't the fact that it has engineering help assist with the question as to whether or not it is deliberately indifferent, and it most definitely does? Paragraphs 30 through 35 and paragraphs 40 and 44 and 45 of the complaint talk about all of the things that the MDEQ defendants did with respect to interacting with the city and with respect to what the two engineering defendants, Lan and Villalea, did. So clearly those would support the fact that there was not deliberate indifference. Any further questions? Thank you, Counsel. I want to thank all Counsel for their arguments in the case. The case will be submitted. From my understanding, the remaining cases will be submitted on briefs. And with that, you may adjourn the Court.